Nos. 26-1987, 26-1991

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in the official capacity as Governor of Pennsylvania,

*Plaintiffs-Appellees*,

*v.*

UNITED STATES POSTAL SERVICE; DAVID STEINER, in the official capacity as Postmaster General, Chief Executive Officer of the Postal Service, and Member of the Postal Service Board of Governors; DOUG TULINO, in the official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in the official capacity as Chair of the Postal Service Board of Governors; DEREK KAN, in the official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in the official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in the official capacity as a Member of the Postal Service Board of Governors,

*Defendants-Appellants*,

STATE OF MISSOURI; STATE OF INDIANA; STATE OF MONTANA; STATE OF LOUISIANA; STATE OF KANSAS; STATE OF NEBRASKA; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF TEXAS; STATE OF OKLAHOMA; STATE OF SOUTH DAKOTA; STATE OF SOUTH CAROLINA,

*Intervenor-Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

**APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTIONS FOR STAY PENDING APPEAL**

*(Counsel listed on inside cover)*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
DAVID C. KRAVITZ
*State Solicitor*
GERARD J. CEDRONE
*Deputy State Solicitor*
VANESSA A. ARSLANIAN
*State Trial Counsel*
JARED B. COHEN
JULIA S. CANNEY
PHOEBE M. LOCKHART
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Counsel for the Commonwealth of Massachusetts*

NICHOLAS W. BROWN
*Attorney General of Washington*
TERA M. HEINTZ
CRISTINA SEPE
KARL D. SMITH
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Tera.Heintz@atg.wa.gov

*Counsel for the State of Washington*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
AARON D. PENNEKAMP
*Supervising Deputy Solicitor General*
IAN FEIN
L. NICOLE ALLAN
*Deputy Solicitors General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
KEVIN L. QUADE
LISA C. EHRLICH
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
ROBERT WILLIAM SETRAKIAN
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

AARON D. FORD
*Attorney General of Nevada*
K. BRUNETTI IRELAND
*Chief of Special Litigation*
1 State of Nevada Way
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

*(Additional counsel listed in signature block)*

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1

Statement of the case........................................................................ 4

Argument............................................................................................ 8

I. USPS and intervenors are unlikely to succeed on the merits.... 8

A. USPS lacks statutory and constitutional authority for its unprecedented interference with state and local elections administration on the eve of a major election .................. 8

B. USPS also failed to comply with multiple procedural requirements ................................................................... 16

II. The equitable considerations weigh heavily against a stay..... 20

Conclusion ......................................................................................... 27

## INTRODUCTION

President Trump has said that he wants to "get rid of MAIL-IN BALLOTS." Dkt. 1 ¶ 4. That is exactly what a stay in this case would allow him to accomplish with respect to the upcoming midterms. In some States, it would be impossible at this point to comply with the last-minute rollout of USPS' novel ballot-verification program. In other States, there will be chaos. State and local elections administrators will have to scramble to obtain USPS approval of new ballot-envelope designs on an unprecedented timetable; purchase new envelopes to replace those already ordered and ready to mail; develop and upgrade technological systems to generate voter-specific Intelligent Mail barcodes (IMbs); upload voter-specific information to USPS' new online portal; ensure that ballots each have the proper IMb for the intended recipient; train state and county-level officials on how to undertake each of these tasks; and attempt to educate voters on USPS' massive changes—all in the span of just a few days or weeks. Each step of this process is fraught with an extreme risk of error. And an error at any step threatens to deny ballots to many voters.

Even if state and local officials were somehow able to implement this new rule perfectly, there is a high risk of mistakes, incompetence, and delay on USPS' part. One statistic from USPS' final rule illustrates how little the agency has thought all of this through. USPS estimates that its ballot-scanning process could

take up to one minute per ballot. 91 Fed. Reg. 54966, 54981 (Aug. 26, 2026). If that is right, it would take USPS approximately *43 years* to scan all of California's 23 million mail ballots, to say nothing of the time required to scan the millions of ballots mailed in other States. A whistleblower within USPS has also recently disclosed "potentially catastrophic problems in the development of the . . . new system for handling federal election ballot mail," which the whistleblower describes as "sloppy and rushed." Letter to Sen. Blumenthal at 1, 4 (Aug. 30, 2026), https://perma.cc/A6A7-KU6B. Because USPS plans to refuse to deliver ballots where information on the envelope does not match data in its new portal, any errors in the process of scanning and verifying ballots will result in the denial of ballots to voters. As a consequence, millions of Americans who have come to depend on mail voting—including in States where that is the only way to vote—are unlikely to receive ballots if USPS' rule takes effect.

Never before in our history has USPS attempted to interfere with a fast-approaching election in this way. When an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority'" on a matter of political significance—that is, in "a major questions case," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022)—the agency must point to clear congressional authorization. Here, USPS cannot do so. Nothing in federal law authorizes USPS to refuse to deliver ballots. Congress

has certainly not authorized USPS to undertake such a far-reaching experiment in elections administration on the eve of a major federal election. To the contrary, Congress has exhaustively enumerated the types of materials—called "nonmailable" materials—that USPS can lawfully refuse to deliver if certain conditions are not met. Ballots are not among the enumerated items. And where Congress has not authorized a form of federal control over the "Times, Places and Manner" of elections, U.S. Const., art. I, § 4, cl. 1, an executive agency may not exercise such control. In our constitutional system, only the States may do so.

The new ballot-verification program is also procedurally defective. When unveiling new rules, agencies must account for "'serious reliance interests'" and the consequences of their actions. *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016). Here, USPS said almost nothing about the States' reliance on existing mail-voting systems or the extreme consequences of rushing out a new ballot-verification and non-delivery program mere weeks before the November elections. USPS must also seek an advisory opinion from the Postal Regulatory Commission (PRC) before making major changes to postal services. USPS bypassed that longstanding rule, which is designed to force it to obtain objective input before adopting far-reaching changes. Had USPS followed the required process, it is not difficult to imagine what the PRC would have said. One current PRC member has warned about the disaster that will ensue if the Rule takes effect. "We haven't run

the tests to give us the validity that the damn thing will work," Commissioner Day explained. Katz, *Postal Officials Say Trump's Mail-Ballot Push Will Create Widespread Errors*, NOTUS (Aug. 27, 2026), https://perma.cc/SFX9-BZBD. "To do it in three weeks, my God, there's no way." *Id.*

In light of the ballot-verification program's serious legal defects and threatened interference with the ability of millions of people to vote, the request for a stay should be denied. Mail-voting laws have made voting easier and more accessible for millions of Americans, especially rural and disabled voters, who face substantial obstacles to voting in person. Indeed, in November 2024, one in three Americans voted by mail. State and local governments have also come to depend on vote-by-mail systems. In some cases, they have built their entire systems of election administration on the understanding that mail voting will be widely available and used by voters. Whatever else may be said of USPS' new rule, it would pull the rug out from under States and their voters if it takes effect in the few weeks that remain before this year's election. Allowing that to happen would be reckless, damaging to democracy, and deeply inequitable.

## STATEMENT OF THE CASE

1. In March 2026, President Trump issued Executive Order 14399. 91 Fed. Reg. 17125 (Mar. 31, 2026). The EO "target[ed] voting by mail" and "directed substantial involvement by [USPS] in deciding which ballots sent to and from

voters would be delivered." *California v. Trump* (*California II*), 183 F.4th 52, 59-60 (1st Cir. 2026). In particular, Section 3 of the EO required USPS to develop a voter-verification and ballot-interception program before the November midterm elections, in which the agency would refuse to deliver mail ballots for voters who are not "enrolled" on a USPS list. EO § 3(b).

Plaintiff States sued, challenging Section 3 of the EO as ultra vires because Congress had not authorized any such program. *See California II*, 183 F.4th at 59. Rather than defend the program's legality, the federal government argued that plaintiffs' challenge was premature and that they could not bring suit until USPS issued a final rule. *See id.* at 63; *California v. Trump* (*California I*), 2026 WL 1826490, at *15 (D. Mass. June 25, 2026). The district court rejected that argument because the reality of administering the November midterm elections would have forced plaintiffs—absent injunctive relief—to "immediately prepare to comply" with the new USPS program. *California I*, 2026 WL 1826490, at *7. On the merits, the court concluded that Section 3 of the EO was ultra vires because "no law enacted by Congress delegates authority to control mail-in voting to USPS," *id.* at *15, and requiring USPS to adopt the new program before the November elections violated "Congress' mandated procedure" for USPS rulemaking, *id.* at *16. The court enjoined USPS from implementing the EO as to plaintiff States for the fall elections. *Id.* at *17-18.

On July 25, this Court declined to stay the injunction pending appeal. It observed that "state and local officials are assigned primary responsibility for administering federal elections," but the EO directed "changes to the voting-by-mail process" that would impede those officials' ability to carry out state mail voting laws. *California II*, 183 F.4th at 66. A month later, on August 24, the Supreme Court stayed the injunction. *Trump v. California*, 609 U.S. ___, 2026 WL 2473573 (2026). It deemed plaintiffs' challenge to the EO nonjusticiable, but made clear that if USPS' "final rule harms the States, they may challenge that rule." *Id.* at *4. And the Court emphasized that its ruling was not intended to suggest the USPS rule "will necessarily be lawful." *Id.* at *5.

2. While the federal government's application to stay the injunction was pending before the Supreme Court, USPS issued its final rule implementing the new ballot-verification program. 91 Fed. Reg. at 54966. As in the proposed rule, *see* 91 Fed. Reg. 32915 (June 2, 2026), the final rule requires States to generate voter-specific IMbs; redesign ballot-mail envelopes to include IMbs and other information; submit new envelope designs for USPS review and approval; upload voter information, including IMbs, to USPS' new online portal; and deliver ballots to USPS for IMbs to be scanned. 91 Fed. Reg. at 54990-54991. If the IMb on an envelope does not match the information in USPS' portal, the ballot "will be returned" and not delivered. *Id.* at 54991.

The Rule was finalized just weeks before the November elections and mere days before mail ballots must be sent to some voters pursuant to state law. *See, e.g.*, N.C. Gen. Stat. § 163-227.10(a). USPS nonetheless assigned the Rule an "immediate effective date" to allow for "implementation of this rule in time for the 2026 general election." 91 Fed. Reg. at 54966. While USPS "recognize[d] that the rule would require states to adjust their processes and adapt to the changes imposed by the rule, potentially incurring new costs," the agency concluded that "there is no compelling reason for any delay." *Id.* at 54985.

On August 26, plaintiff States filed this lawsuit challenging the USPS rule. Dkt. 1. On the same day, the plaintiffs in a related case, *see League of Women Voters of Mass. v. Trump*, No. 26-cv-11549 (D. Mass.), supplemented their complaint, and both plaintiff groups promptly filed motions for a temporary restraining order and preliminary injunction, *e.g.*, Dkt. 5. On August 27, the district court granted a TRO prohibiting USPS from implementing aspects of its final rule as to the November elections for 14 days, while the expedited preliminary-injunction proceedings continue. Dkt. 31 at 10-11. The preliminary-injunction motions are now fully briefed, and a hearing is set for September 3. Dkt. 7. Although the TRO will expire on September 10, *see* Dkt. 31 at 10, USPS and intervenors appealed, Dkts. 42, 60, and moved to stay the order pending

appeal, Dkts. 58, 61. The district court denied those motions. Dkt. 72; *see League of Women Voters*, No. 26-cv-11549, Dkt. 242.

## ARGUMENT

"Generally, a TRO is not immediately" appealable. *R.I State Council of Churches v. Rollins*, 158 F.4th 304, 311 (1st Cir. 2025). That is because "TROs are of short duration and usually terminate with a prompt ruling on a preliminary injunction, from which the losing party has an immediate right of appeal." *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006). Here, the TRO expires in just 9 days; the district court is proceeding rapidly toward a decision on plaintiffs' preliminary-injunction motion; the assertions of USPS and intervenors that they will suffer irreparable harm over the next 9 days are unconvincing; and no part of the TRO "act[s] as a mandatory injunction requiring affirmative action," *id.* at 1006. This Court thus lacks appellate jurisdiction. If the Court concludes otherwise, however, it should deny a stay. USPS and intervenors have not made a "strong showing" that they are likely to succeed on the merits, or that the equities favor a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

### I. USPS and Intervenors Are Unlikely to Succeed on the Merits

#### A. USPS Lacks Statutory and Constitutional Authority for its Unprecedented Interference with State and Local Elections Administration on the Eve of a Major Election

1. A federal agency "'literally has no power to act' . . . unless and until Congress authorizes it to do so." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). That

principle is especially clear in the context of federal elections because the Constitution commits control over such elections to Congress and the States, not the Executive. *See* U.S. Const. art. I, § 4, cl. 1. Here, however, the only statutes invoked by USPS do not mention the subject of its final rule: ballot verification and non-delivery. *See* U.S. Mot. 15-16; Interv. Mot. 13-15. The relevant provisions instead use generic language to grant USPS authority to adopt "rules and regulations . . . as may be necessary in the execution of its functions"; engage in "powers incidental, necessary, or appropriate to the carrying on of its functions"; and "provide for the collection, handling, transportation, [and] delivery" of mail. 39 U.S.C. § 401(2), (10); *id.* § 404(a)(1). But where an agency announces "'a transformative expansion in [its] regulatory authority'" on a question of economic or political significance, *West Virginia*, 597 U.S. at 724, such generic language does not suffice. The agency must show that it enjoys "clear congressional authorization." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

USPS and intervenors argue that no clear statutory authorization is required because the final rule is "modest" and "does not regulate elections." U.S. Mot. 1, 17; *see* Interv. Mot. 3, 16. According to USPS, the Rule "regulates only how States must design and label [ballot] envelopes" and "requires States to provide information to USPS." U.S. Mot. 17, 18. But that description ignores three of the Rule's most important features—features that alone or in combination make clear

that the new ballot-verification scheme is "no 'everyday exercise of federal power.'" *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). First, the Rule calls for USPS not to deliver ballots. "[O]utbound mail-in ballots may be rejected from the mailstream as a consequence of noncompliance with the rule's requirements." 91 Fed. Reg. at 54973-54974. At no prior point has USPS refused to deliver ballots. *See, e.g.*, Dkt. 4-1 ¶ 30. Second, USPS is making decisions about whether or not to deliver ballots based on an untested data-submission and matching process that threatens mass error and disenfranchisement. *Infra* pp. 21-26. Third, USPS is rushing out this novel ballot-verification program mere weeks before a major federal election, thereby threatening "significant cost, confusion, [and] hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Had Congress intended to authorize USPS to take these unprecedented steps, it would have spoken far more "clearly." *Util. Air*, 573 U.S. at 324.[1]

In its final rule, USPS argued that this case is not one of "economic" or "political significance." 91 Fed. Reg. at 54973 (quoting *Learning Res., Inc. v.*

---

[1] USPS wrongly assumes that plaintiffs would view "*any* election-mail-specific rules" as ultra vires. U.S. Mot. 18. The examples discussed by USPS—such as "prioritization" of ballot mail or delivery of "absentee balloting materials" "even if a mailer does not affix the necessary postage," *id.* (internal quotation marks omitted)—lack the sweeping features of the ballot-verification and non-delivery scheme challenged here. Indeed, the examples discussed by USPS make it *easier* for ballots to be delivered and returned. They do not pose the risks of non-delivery and disenfranchisement at issue in this case.

*Trump*, 607 U.S. 229, 246 (2026) (plurality)). But the estimated costs of compliance by the plaintiff States alone are substantial. *See* Dkt. 4-1–4-26. And setting aside questions of "economic significance," the Rule challenged here arguably has greater *political* significance than the subject of any of the Supreme Court's prior major-questions cases. Roughly one in three of all voters cast ballots by mail in the November 2024 election. *See* U.S. Election Assistance Comm'n, *Election Admin. and Voting Survey*, at ii (June 2025), https://perma.cc/8J5Y-5TVN. Some States—such as Washington and Oregon—have virtually eliminated in-person voting and now provide for universal voting by mail. *Infra* p. 26. Because the Rule's last-minute requirements will make mail voting impossible in some States and threaten to deprive many voters of mail ballots in others, *see infra* pp. 21-26, the Rule threatens to have a profound, catastrophic impact on our most cherished franchise: the right to vote. If that does not make this case one of "political significance," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (internal quotation marks omitted), it is hard to see what would.[2]

[2] The major-questions doctrine also applies expansively in cases that involve a "core congressional power," *Learning Res.*, 607 U.S. at 243 (plurality), or that "significantly alter the balance between federal and state power," *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). This case implicates both concerns, given that the Framers deliberately entrusted power over elections to Congress and the States, not the President.

Even setting aside major-questions considerations, USPS lacks statutory authority for the new rule because it contravenes specific laws governing "mailability." Congress has exhaustively delineated the categories of materials that USPS can lawfully refuse to deliver. *See, e.g.*, 39 U.S.C. §§ 3001-3018. Ballots are not among them. And it has long been settled that the "postal laws make a clear-cut division between mailable and nonmailable material," *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 152 (1946), and that USPS "cannot exclude or refuse to deliver" mail unless specifically authorized by "some law of Congress." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902); *see generally Esteras v. United States*, 606 U.S. 185, 195 (2024) (when Congress enumerates an "'established series,' . . . any 'omission' from that series necessarily 'bespeaks a negative implication'").

In its final rule, USPS suggested that the new verification and non-delivery policy does not qualify as a "mailability" restriction because it imposes "conditions on the acceptance of mailable matter" without "prohibit[ing] federal ballots from being mailed altogether." 91 Fed. Reg. at 54973-54974. But the same could be said of many restrictions expressly treated as "mailability" rules by Congress. *See, e.g.*, 39 U.S.C. § 3001(n)(1) ("hazardous material is nonmailable" unless "authorized by" conditions imposed by USPS pursuant to regulation); *id.* § 3001(g) (fragrance ad samples nonmailable unless sealed in certain way); *id.* § 3010

(conditions on mailing of sexually oriented ads). USPS cannot invent its own definition of "mailability" that ignores the way Congress has used the term.

The examples of delivery restrictions highlighted by USPS only confirm the need for express congressional authorization. USPS focuses on restrictions governing cremated remains and replica explosives. U.S. Mot. 16-17. But Congress provided express authorization for those restrictions. Specifically, it provided that "all explosives, hazardous materials, . . . and all other natural . . . material which may kill or injure another," "are nonmailable," 18 U.S.C. § 1716(a), unless mailed "in accordance with [USPS] rules and regulations," *id.* § 1716(j)(1).[3] USPS can also "refuse to mail a heavy package if the customer failed to pay sufficient postage," Dkt. 65 at 15, because "[m]atter which . . . exceeds [USPS-devised] size and weight limits . . . is nonmailable," 39 U.S.C. § 3001(c)(1)(A).[4] Here, by contrast, USPS cannot point to any congressional enactment that authorizes ballot verification and non-delivery—certainly nothing that authorizes USPS to impose a non-delivery scheme mere weeks before a federal election in a way that threatens to deny ballots to millions of voters.

[3] *See also* USPS, Publication 52, Ch. 2, § 211, https://perma.cc/2J4D-GJQ3 (last accessed Sept. 1, 2026); *id.*, Ch. 4, §§ 434 (Replica or Inert Explosive Devices), 451.22 (Cremated Remains).

[4] USPS also has express authority to impose conditions on misleading solicitations that would allow it to address "elder-abuse mail scams." U.S. Mot. 19; *see, e.g.*, 39 U.S.C. §§ 3001(d), 3005.

2. Although USPS does not dispute that plaintiffs have a cause of action to bring the foregoing challenge to USPS' statutory authority, *see* U.S. Mot. 14-15, it argues that review "'is quite narrow'" because the agency "is exempt from review under the Administrative Procedure Act," *id.* at 14. But the U.S. Supreme Court has "decline[d] to decide" when and in what circumstances USPS is subject to APA review. *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523 (1991). This Circuit has not yet weighed in on the question. And there is good reason to think that USPS is subject to APA review, at least in many cases. *See, e.g.*, Br. of Respondents 12-18, *Air Courier Conf. of Am.*, 1990 WL 10022396.

In fact, the APA plainly applies to USPS "proceedings concerning the mailability of matter." 39 U.S.C. § 3001(m). For the reasons discussed above, *supra* pp. 12-13, this rulemaking proceeding concerns "the mailability of matter": specifically, the mailability of ballots. And USPS' rule is not "in accordance with law," 5 U.S.C. § 706(2)(A), because the agency cannot identify any statutory authority—let alone "clear" authority, *Util. Air*, 573 U.S. at 324—for its novel ballot-verification and non-delivery program.

Even if the APA did not apply, plaintiffs' claim that the final rule exceeds USPS' authority is still subject to review. The Supreme Court has recently—and repeatedly—held that "plaintiffs may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious action by a public officer.'"

*Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). The decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), provides a classic illustration: plaintiffs argued that the President's seizure of steel mills was ultra vires because it was "not authorized by an act of Congress or by any constitutional provisions." *Id.* at 583. Plaintiffs' argument here—that USPS lacks any statutory or constitutional basis for its rule—is materially indistinguishable. *See Doe v. Trump*, 157 F.4th 36, 46-47 (1st Cir. 2025).

According to USPS, plaintiffs can succeed on an "ultra vires" claim only if they show that USPS' rule violates a "specific" and "mandatory" statutory prohibition. U.S. Mot. 14-15 (citing *NRC v. Texas*, 605 U.S. 665 (2025)). The Supreme Court, however, has applied that standard only in circumstances where another statute precludes judicial review. *See NRC*, 605 U.S. at 680-682 (Hobbs Act); *Leedom v. Kyne*, 358 U.S. 184, 187-188 (1958) (Wagner Act). In other recent cases where no statute expressly bars review, the Court has considered whether the President exceeded his statutory authority without applying the *NRC* standard. *See, e.g.*, *Cook*, 146 S. Ct. at 2246-2251 & n.2; *Learning Res.*, 607 U.S. at 248-255; *Trump v. Illinois*, 146 S. Ct. 432, 434 (2025). Here, as in those cases, plaintiffs may challenge the final rule as ultra vires on the ground that it was "unauthorized by any law." *Am. Sch. of Magnetic Healing*, 187 U.S. at 110; *see*

*also, e.g.*, *Sears, Roebuck & Co. v. USPS*, 844 F.3d 260, 265 (D.C. Cir. 2016); *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003).[5]

### B. USPS Also Failed to Comply with Multiple Procedural Requirements

At least three serious procedural flaws provide additional reasons to enjoin the Rule for this year's rapidly approaching midterms. USPS declines to address these arguments on the view that this Court "ordinarily will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court." U.S. Mot. 21 n.4 (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002)). But the Court *is* willing to uphold a preliminary injunction on "alternate theories that present abstract legal questions," as opposed to "fact-sensitive" issues. *New Comm Wireless*, 287 F.3d at 13. Because plaintiffs' procedural arguments are purely legal, the Court is free to address them and deny the stay on that basis. At a minimum, the fact that the district court is currently weighing these arguments (among others) in the context of plaintiffs' preliminary-injunction motion highlights why appellate review of the TRO is inadvisable in the brief period before that motion is resolved. *Supra* p. 8.

---

[5] Even if USPS' proffered standard applied, USPS' final rule violated "specific" and "mandatory" restrictions on the issuance of mailability restrictions. *Supra* pp. 12-13.

First, USPS flouted the APA's requirement that its decision be both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024); *see* 5 U.S.C. § 706(2)(A). USPS devoted a single paragraph to its explanation for applying the Rule to this year's rapidly approaching midterms. *See* 91 Fed. Reg. at 59485. USPS purported to acknowledge the "logistical or financial difficulties [that] states may face complying with the rule, including some claims that immediate implementation would prove impossible." *Id.* But USPS nowhere acknowledged or grappled with the *consequences* of States' inability to comply—in particular, the threat that millions of Americans will be unable to vote by mail this year and the immense costs and challenges that States will face in offering in-person voting when they have relied for years on mail voting. *Infra* pp. 21-26; *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30-32 (2020). USPS also brushed aside States' concerns by asserting—without further analysis or explanation—that the "visibility and law-enforcement benefits of the rule" justified immediate implementation. 91 Fed. Reg. at 59485. "[C]onclusory statements do not suffice" to explain an agency's decision, *Encino Motorcars*, 579 U.S. at 224, and USPS elsewhere expressly declined to make any findings about "the incidence of [mail] voter fraud," 91 Fed. Reg. at 54969.[6]

[6] If the Court concludes that the APA is inapplicable, *but see supra* p. 14, it would not make a difference to this claim. Even in contexts where courts have
(continued…)

Second, USPS violated the APA's requirement that rules have an effective date at least 30 days after the rule is published in the Federal Register. 5 U.S.C. § 553(d). Congress required that period to ensure that affected parties have a "reasonable time to prepare" and adjust their behavior before a new rule takes effect. *Rowell v. Andrus*, 631 F.2d 699, 703 (10th Cir. 1980). Here, however, USPS assigned the Rule an "immediate effective date" five days *before* publication. 91 Fed. Reg. at 54966. USPS' explanation that it did so to "ensure[] the maximum possible time for election officials to adjust their ballot mail envelopes to meet the new preparation standards" is illogical. *Id.* at 59485. The immediate effective date gave those officials *less* time to try to prepare for compliance with the Rule. USPS also asserted that "[d]elaying the effective date would jeopardize implementation of this rule in time for the 2026 general election." *Id.* at 54966. But USPS' desire to rush out the Rule cannot, on its own, provide the necessary "good cause" to ignore Congress's procedural requirements, 5 U.S.C. § 553(d)(3)—particularly where the timing of the final rule's release so close to those elections was of the agency's "own making," *Natural Res. Def.*

---

treated USPS as exempt from the APA, they have subjected the agency to a "reasoned decisionmaking" requirement that is similar to APA-style arbitrary-and-capricious review, particularly when an agency's rule is, as here, "utterly unreasonable." *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 975 (D.C. Cir. 2022); *Sears, Roebuck & Co*, 844 F.3d at 265-266.

*Council v. Abraham*, 355 F.3d 179, 205 (2d Cir. 2004). And had USPS not rushed the effective date, the 14-day TRO at issue may have been unnecessary altogether.

Third, USPS failed to seek an advisory opinion from the Postal Regulatory Commission before making a "change in the nature of postal services" that will "generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). In its final rule, USPS asserted that it had no obligation to consult with the PRC because the final rule will not have a "meaningful impact" on postal services. 91 Fed. Reg. at 54976 (quoting *Buchanan v. USPS*, 508 F.2d 259, 262-263 (5th Cir. 1975)); *see also* Interv. Mot. 21-23. But the final rule will indisputably have a meaningful impact on USPS' delivery of mail ballots. *Infra* pp. 21-26. That such ballots are a "subset" of the mailstream is irrelevant. 91 Fed. Reg. at 54976. USPS has previously requested advisory opinions even when the proposed change would affect only a subset of the mailstream.[7] And the impact from USPS' time-intensive new verification program will be "meaningful" on any scale. For example, the final rule requires each outgoing mail ballot to be scanned and processed by a USPS employee to verify the "presence of scanned barcodes" in the portal. *Id.* at 54981. USPS estimates that verification could take "a minute per mailpiece." *Id.* But USPS delivered over 50 million mail ballots in the last

[7] *See, e.g.*, 87 Fed. Reg. 18044 (Mar. 29, 2022) (requesting advisory opinion on changes to subset of retail ground and parcel select ground mail).

midterm elections. *See* USPS, 2022 Post-Election Analysis Report at 3, https://perma.cc/J5GA-JNBT. At one minute per mailpiece, these "operational changes" to how USPS processes mail ballots would require *over 95 years* of employee time. *Contra* Interv. Mot. 22. That "quantitative" impact on USPS operations will inevitably have a "meaningful impact on service." *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 884 (E.D. Pa. 2020).[8]

## II. The Equitable Considerations Weigh Heavily Against a Stay

1. USPS and intervenors have not identified any irreparable harm that would result from the TRO. As the district court observed in denying a stay, the TRO "allow[s] the USPS to establish the Ballot Mail Portal and communicate with States about design standards so long as States' participation is not required." Dkt. 72. The TRO also "does not bar any State from seeking USPS approval of their ballot designs or uploading voter information to the Portal." *Id.* Rather, the TRO limits only "the mandatory nature of the Final Rule, not voluntary participation by States that choose to [participate]." *Id.*

[8] USPS argued below that plaintiffs were required to exhaust this claim before the PRC before bringing it in court. Dkt. 17 at 12. That is incorrect. *See DeJoy*, 490 F. Supp. 3d at 862, 864 (rejecting similar contention). There was certainly no need to proceed before the PRC where it would have been impossible to obtain emergency relief ahead of the imminent November elections. *See New York v. Trump*, 181 F.4th 132, 140 n.3 (D.C. Cir. 2026).

Intervenors contend that they are still harmed because the TRO prevents USPS from delivering "only compliant ballots" and rejecting non-compliant ones. Interv. Mot. 26. Notably, the only intervenor declaration in the record does not even establish that any intervenor State intends to mail ballots to voters through USPS in the 14-day period that the TRO is in effect. Dkt. 64-1.[9] USPS points to North Carolina, which must mail ballots by September 4, highlighting the remarks of one state official who expressed confidence in North Carolina's ability to comply with the Rule. U.S. Mot. 11. But ballots are mailed out in North Carolina by 100 separate county boards of elections, *see* Dkt. 4-18 at 2, and none of them has suggested that it would be feasible to mail compliant ballots by the end of this week. To do so, counties would first be obligated under the Rule to enroll voters into USPS' online portal. *Id.* at 15-16. USPS offers no basis for concluding that it would be possible to do so in the next few days. Indeed, the portal is not yet even operational. Dkt. 4-1 at 14; Dkt. 100-1 at 6. And a recent whistleblower

[9] USPS asserts that Alabama "intend[s] to begin mailing ballots" on September 9. U.S. Mot. 12. But the provision invoked by USPS, *see* Ala. Code § 17-11-12, does not address sending ballots to voters. It provides that "the officer charged with the printing and distribution of the official ballots and election supplies shall deliver to the *absentee election manager* of each county . . . a sufficient number of absentee ballots, envelopes, and other necessary supplies" at least "55 days prior to the holding of any election." Alabama has also said nothing to confirm that its ballot envelopes actually comply with the Rule's requirements; that it has input voter information to the USPS portal (which is not yet operational); and that it then intends to mail compliant ballots to voters, all in the short period while the TRO is in effect.

disclosure provides grave doubts that USPS's "entirely new and untested set of IT systems" will be reliably up and running. Letter to Sen. Blumenthal, *supra*, at 1.

In any event, nothing in the TRO restricts any State from sending USPS only "compliant ballots." Interv. Mot. 26. If intervenors are capable of complying with all of USPS' new restrictions—as they assert, *see id.* at 28—they should have no need for USPS to reject noncompliant ballots. There is also nothing preventing intervenors from deploying their own "election integrity measures" while the TRO is in effect. *Id.* at 26. Before last week, no similar USPS rule ever existed. Yet, States have long employed protocols to verify voter eligibility and protect against mail-ballot fraud.[10] And studies have repeatedly demonstrated that fraud related to mail voting is extraordinarily rare, undercutting any claim of irreparable harm. *See* Dkt. 1-1 at 19 & n.12.[11]

2. Granting a stay, by contrast, would threaten catastrophic harms for plaintiff States and the public. After considering the "unrebutted declarations" in the record, the district court concluded that compliance with the Rule for plaintiffs

[10] *See, e.g.*, Nat'l Conf. State Legislatures, *How States Verify Voted Absentee/Mail Ballots* (updated May 20, 2026), https://perma.cc/RVF3-9KAL.

[11] *See, e.g.*, Angel et al., *Mail Voting in the US: Data Points to Very Low Fraud and Significant Benefits to Voters*, Brookings (Nov. 6, 2025), https://perma.cc/E3WD-8AN7; Barreto et al., *Debunking the Myth of Voter Fraud in Mail Ballots*, UCLA Voting Rights Project (Apr. 14, 2020), https://perma.cc/MS8G-VM9M.

would be "practically impossible as to the 2026 midterm elections." Dkt. 31 at 8-9. "Most Plaintiff States have already ordered their mail ballots" and "have neither time nor funds to design new mail ballots, seek approval of the new designs, order production of mail ballots, update their own election management systems, train election officials to use the USPS portal, and upload citizen data to the portal, all before the midterms." *Id.*

Wisconsin's experience is illustrative. As the Republican-appointed official who chairs the Wisconsin Elections Commission has explained, "[i]t would be virtually impossible for Wisconsin to comply with the Rule." Dkt. 100-1 ¶ 21. Municipal clerks are required to mail out absentee ballots to all requests on file no later than September 17, and the State lacks sufficient time (and funds) to reprint the ballot envelopes that it has already printed for the November elections. *See id.* ¶¶ 15, 29. Wisconsin's envelopes could only become mailable under the new USPS rule if the State's elections officers could "print and hand-affix stickers with the Rule-compliant IMb codes on" each envelope. *Id.* But completing that work in time for the midterms would be "impossib[le] for many jurisdictions"—particularly "rural municipalities," which may not even "have the required label printing capability" and "often have a single employee performing all elections-related work." *Id.* ¶ 30.

Like many States, Wisconsin relies on thousands of municipal employees, rather than centralized state officials, to make absentee voting changes to voter databases. *See* Dkt. 100-1 ¶ 5. To enroll voters with USPS' new portal, then, those thousands of employees "would need to be trained in how to use the new technology, become authorized users, and then enter the data" required by the Rule. *Id.* ¶ 26. "[F]ull and accurate compliance is extremely unlikely" on that compressed timeframe. *Id.* The Rule thus risks "disenfranchisement for . . . eligible voter[s]" in Wisconsin—including "populations that are particularly dependent on absentee voting, such as voters in rural areas, voters with disabilities, and voters that lack reliable means of transportation." *Id.* ¶ 34.

Other States offer similar accounts. Washington has already printed 5.1 million voter ballot packets, and two of its three printing vendors have said that they cannot reprint ballot envelopes, and it is "very unlikely" that the third vendor could reprint envelopes for the entire State. Dkt. 4-4 at 20-21. Oregon has "neither the time nor the money to design, review, and reorder envelopes before ballots begin to be mailed to [the State's approximately 3 million] voters in mid-September." Dkt. 4-19 at 13-14. In Colorado, nearly 1.3 million existing ballot return envelopes will have to be discarded, and re-printing these envelopes "may not even be possible." Dkt. 4-6 at 17-18. And Hawai'i reports it "may not be

possible to get new . . . envelopes delivered to Hawai'i from the continent on such short notice." Dkt. 4-10 at 12.

Even assuming that some States could replace their current ballots with USPS-approved ballots, other aspects of the Rule make it infeasible to comply this election cycle. For example, California's voter registration system "is not currently equipped to receive IMb information for individual voters," and the systems used by each of California's 58 counties likewise are not prepared "to store and transmit" this IMb information. Dkt. 4-1 at 9. Those systems would need to be updated before the State could begin mailing compliant ballots—an impossible proposition, given that similar modifications have historically "take[n] more than a year to develop, test, . . . and deploy." *Id.* Other States face similar obstacles. *See, e.g.*, Dkt. 4-15 at 9 (New Jersey); Dkt. 4-21 at 9-10 (Rhode Island).

Even if States were in a position to comply, USPS' untested verification programs present serious risks of errors and disenfranchisement. No one knows, for example, if USPS' new online "portal" for enrolling voters or its ballot-scanning technology will actually function as intended. *E.g.*, Dkt. 4-1 at 14. Recent revelations from a USPS whistleblower raise significant concerns that it will not, *supra* p. 2, as do alarmed comments from a member of the Postal Regulatory Commission, *supra* pp. 3-4. Nor is it clear that USPS can competently administer a ballot-verification program that is unlike anything it has ever

undertaken. Its performance in recent years has not been encouraging. *See, e.g.*, Dkt. 4-2 at 8 (discussing recent USPS implementation failures); 4-4 at 9-10 (same); 4-5 at 9-11 (same).

For many voters, the unavailability of mail voting would, as a practical matter, make it impossible to vote at all. Disabled voters, for example, face so many barriers to voting in person that voting by mail is often "their only option to cast a ballot." Press Release, *Association of People with Disabilities Applauds Supreme Court Protecting Mail Ballot Grace Periods* (June 29, 2026), https://perma.cc/2QGV-4JV2. And in some States, a return to the prior era of in-person voting is not an option. For example, Washington is an entirely vote-by-mail state and "the State no longer has the infrastructure to accommodate a last-minute reversion to in-person voting." Dkt. 4-4 at 21. In Hawai'i, there is "simply insufficient time to coordinate the necessary polling places, volunteers, and logistical framework that would be necessary to emulate the prior polling place model that existed prior to the advent of elections by mail." Dkt. 4-10 at 7. And "Oregonians have no other means by which to cast their votes." Dkt. 4-19 at 6. To preserve the ability of millions of people to vote—and prevent the chaos and confusion that would result from allowing the USPS rule to take effect for even a brief period—the Court should deny the requested stay.

## CONCLUSION

The motions for a stay pending appeal should be denied.

Dated: September 1, 2026

Respectfully Submitted,


ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

DAVID C. KRAVITZ
*State Solicitor*
GERARD J. CEDRONE
*Deputy State Solicitor*
VANESSA A. ARSLANIAN
*State Trial Counsel*
JARED B. COHEN
JULIA S. CANNEY
PHOEBE M. LOCKHART
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Counsel for the Commonwealth of Massachusetts*

ROB BONTA
*Attorney General of California*

By: */s/ Ian Fein*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
AARON D. PENNEKAMP
*Supervising Deputy Solicitor General*
IAN FEIN
L. NICOLE ALLAN
*Deputy Solicitors General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
KEVIN L. QUADE
LISA C. EHRLICH
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
ROBERT WILLIAM SETRAKIAN
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

AARON D. FORD
*Attorney General of Nevada*
K. BRUNETTI IRELAND
*Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

NICHOLAS W. BROWN
*Attorney General of Washington*
TERA M. HEINTZ
CRISTINA SEPE
KARL D. SMITH
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Tera.Heintz@atg.wa.gov

*Counsel for the State of Washington*

KRISTIN K. MAYES
*Attorney General of Arizona*
KARA KARLSON
KAREN J. HARTMAN-TELLEZ
SYREETA TYRELL
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-8118
Kara.Karlson@azag.gov

*Counsel for the State of Arizona*

PHILIP J. WEISER
*Attorney General of Colorado*
SHANNON STEVENSON
*Solicitor General*
PETER BAUMANN
*Senior Assistant Attorney General*
1300 Broadway
Denver, CO 80203
(720) 508-6400
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*
MAURA MURPHY
*Deputy Associate Attorney General*
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov

*Counsel for the State of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorneys General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

BRIAN L. SCHWALB
*Attorney General of the District of Columbia*
CAROLINE S. VAN ZILE
*Solicitor General*
KARTHIK P. REDDY
*Special Assistant Attorney General*
400 6th Street, NW
Washington, DC 20001
(202) 724-6609
caroline.vanzile@dc.gov

*Counsel for the District of Columbia*

ANNE E. LOPEZ
*Attorney General of Hawai'i*
KALIKO'ONALANI D. FERNANDES
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

KWAME RAOUL
*Attorney General of Illinois*
JANE ELINOR NOTZ
*Solicitor General*
ALEX HEMMER
*Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

*Counsel for the State of Illinois*

AARON M. FREY
*Attorney General of Maine*
KATHERINE W. THOMPSON
*Special Counsel*
6 State House Station
Augusta, ME 04333
(207) 626-8800
Kate.Thompson@maine.gov

*Counsel for the State of Maine*

ANTHONY G. BROWN
*Attorney General of Maryland*
JULIA DOYLE
*Solicitor General*
VIRGINIA A. WILLIAMSON
*Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*

DANA NESSEL
*Attorney General of Michigan*
NEIL GIOVANATTI
*Assistant Attorney General*
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

KEITH ELLISON
*Attorney General of Minnesota*
ANGELA BEHRENS
ALLEN COOK BARR
*Assistant Attorneys General*
LINDSEY E. MIDDLECAMP
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Angela.Behrens@ag.state.mn.us

*Counsel for the State of Minnesota*

JENNIFER DAVENPORT
*Attorney General of New Jersey*
MEGHAN K. MUSSO
JONATHAN MANGEL
JOSHUA P. BOHN
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Counsel for the State of New Jersey*

RAÚL TORREZ
*Attorney General of New Mexico*
BAILEY COLFAX
*Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
bcolfax@nmdoj.gov

*Counsel for the State of New Mexico*

LETITIA JAMES
*Attorney General of New York*
BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
RABIA MUQADDAM
*Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046
Judith.Vale@ag.ny.gov

*Counsel for the State of New York*

JEFF JACKSON
*Attorney General of North Carolina*
LAURA HOWARD
*Chief Deputy Attorney General*
DANIEL P. MOSTELLER
*Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

DAN RAYFIELD
*Attorney General of Oregon*
THOMAS H. CASTELLI
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Thomas.Castelli@doj.oregon.gov

*Counsel for the State of Oregon*

PETER F. NERONHA
*Attorney General of Rhode Island*
MEGAN ROK
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
mrock@riag.ri.gov

*Counsel for the State of Rhode Island*

CHARITY R. CLARK
*Attorney General of Vermont*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.Kane@vermont.gov

*Counsel for the State of Vermont*

JAY JONES
*Attorney General of Virginia*
TILLMAN J. BRECKENRIDGE
*Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 786-7704
tbreckenridge@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

JOSHUA L. KAUL
*Attorney General of Wisconsin*
LYNN LODAHL
*Assistant Attorney General*
17 West Main Street
Madison, WI 53707
(608) 264-6219
Lynn.Lodahl@wisdoj.gov

*Counsel for the State of Wisconsin*

JOSH SHAPIRO
*Governor of the Commonwealth of Pennsylvania*
MICHAEL J. FISCHER
*Executive Deputy General Counsel*
JACOB B. BOYER
*Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for the Governor of the Commonwealth of Pennsylvania*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1. Appellants have filed an unopposed motion for permission to file one consolidated 6500-word opposition to two pending stay motions. If the Court grants the request, this document complies with the extended limit of 6500 words and complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,493 words and thus does not exceed the anticipated 6500-word limit. If the court denies the request, this brief exceeds the 5200-word limit otherwise set by Fed. R. App. P. 27(d)(2)(A).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in proportionally spaced typeface using Microsoft Word word-processing system in Times New Roman that is at least 14 points.

*/s/ Ian Fein*
Ian Fein
Deputy Solicitor General

## CERTIFICATE OF SERVICE

On September 1, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Ian Fein*
Ian Fein
Deputy Solicitor General